AO106(Rev.5/85) Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

In the Matter of the Search of
(Name, address or brief description of person, property, or premises to be searched)

Digital, Magnetic and Electronic Storage Devices
Seized from 602 Saint Georges Station Road,
Reisterstown, Maryland
 and located at 601 4th Street, N.W., Washington, D.C.

## APPLICATION AND AFFIDAVIT
## FOR SEARCH WARRANT

CASE NUMBER:

(Further described below)

I ___Daniel M. Bradley_____ being duly sworn depose and say:

I am a(n) ___Special Agent with the Bureau of Alcohol, Tobacco Firearms_____ and have reason to believe
(Official Title)

that  (name, description and or location)
within certain digital, magnetic and electronic storage devices described more fully in the affidavit attached
hereto and incorporated by reference herein

in the District of Columbia, there is now concealed a certain person or property, namely  (describe the person or property to be searched)
See Attachment A which is attached hereto and incorporated by reference herein

which is (state one or more bases for search and seizure set forth under Rule 41(c) of the Federal Rules of Criminal Procedure)

The fruits, instrumentalities and evidence of crimes described in the affidavit attached hereto and incorporated herein
by reference
concerning a violation of Title 18  United States Code, Section(s) 2252A, 2422(b)  .  The facts to support a finding of
Probable Cause are as follows:

SEE ATTACHED AFFIDAVIT HEREIN INCORPORATED BY REFERENCE AS IF FULLY RESTATED HEREIN

Continued on the attached sheet and made a part hereof.     YES   x☐   NO

Patricia Stewart
Federal Major Crimes Section
(202)202-514-7064

Signature of Affiant
Daniel M. Bradley, Special Agent
Federal Bureau of Investigation (FBI)

Sworn to before me, and subscribed in my presence

_____
Date

at Washington, D.C.

_____
Name and Title of Judicial Officer

_____
Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Daniel M. Bradley, being duly sworn, hereby depose and say:

1.      I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since March 2006.  I am currently assigned to the Washington Field Office.

2.      Since joining the FBI, I have been involved in investigations that concern the interstate transportation of obscene materials, crimes against children, and crimes involving child pornography.  I have gained expertise in the conduct of such investigations through training in seminars, classes, and everyday work related to conducting these types of investigations.  I've attended a 40-hour training seminar on Internet Investigations, provided by the FBI's Innocent Images National Initiative. I am currently assigned to the FBI/Metropolitan Police Department (MPD) Innocent Images Task Force assigned to investigate on-line offenses involving children, including the production, distribution, receipt and possession of child pornography and on-line exploitation offenses. In the course of my duties I have worked as an investigator, participated in search warrants and surveillance, and worked in an undercover capacity on-line where I have engaged in conversations with individuals seeking to engage in sexual activity with children.  I have been the affiant on search warrants involving the search and analysis of computers.

3.      I respectfully submit this affidavit in support of an application for a warrant to search computer equipment including hard drives, CDs, flash drives and other devices designed to store computer files and digital media (the "EQUIPMENT") seized pursuant to a consent search of the premises located known as 602 Saint Georges Station Road, Reisterstown, Maryland 21136 (the "PREMISES") and currently located within the District of Columbia..  For the reasons set forth in this affidavit, there is probable cause to believe that Michael Gene Reed unlawfully received and possessed  child pornography on one or more computers formerly, located on these premises, in

violation of Title 18, United States Code, Section 2252A, and that he used a computer formerly located on those premises to attempt to entice a minor into engaging in sexual activity for which he could be prosecuted in violation of Title 18, United States Code, Section 2422(b) and that there presently are located in the EQUIPMENT seized from the PREMISES and currently located in the District of Columbia, evidence, fruits, and instrumentalities of those offenses, as described in Attachment A.

## FACTS AND CIRCUMSTANCES

4.      The statements in this affidavit are based in part on information provided by other law enforcement agents including Special Agents of the Federal Bureau of Investigation (FBI,) and on my experience and background as Special Agent for the FBI. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the violations of Title 18, United States Code, Section 2252A (possession and/or transportation of child pornography) and Title 18, United States Code, Section 2422(b) (enticement of a minor into engaging in sexual activity) are presently located within the EQUIPMENT seized from the PREMISES.

5.      This affidavit is organized as follows:  Paragraphs 6 and 7 provide relevant statutory authority.  Paragraph 8 provides definitions of terms used throughout the balance of this Affidavit. Paragraphs 9 through 11 provide background information concerning the use of computers and the internet generally and with respect to child pornography.  Paragraphs 12 through 18 discuss the characteristics of collectors of child pornography.  Paragraphs 19 through 26 discuss this investigation and the factual basis for my opinion that there is probable cause to believe that

evidence of the transmission of child pornography and of the offense of attempted enticement of a minor child are located in the EQUIPMENT seized from the PREMISES.  Paragraphs 27 through 37 request permission to search the EQUIPMENT seized from the PREMISES and describe the methods of that search.

## **STATUTORY AUTHORITY**

6.     This investigation concerns alleged violations of Title 18, United States Code, Section 2252A(a)(1) - certain activities relating to material involving the sexual exploitation of minors and involving attempted enticement of a minor in violation of Title 18, United States Code, Section 2422(b).

7.     The relevant statutory text for purposes of this Affidavit are:

    a.     Title 18, United States Code, Section 2252A(a)(2) states:  Any person who . . . knowingly receives or distributes...

> any child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer, any child pornography . . shall be punished as provided in subsection (b).

> Title 18, United States Code, Section 2252A(4)(B) states: Any person who...knowingly possesses any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, shipped or transported in interstate commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer...shall be punished as provided in subsection (b).

    b.     Title 18, United States Code, Section 2256(2)(A)

> defines "sexual explicit conduct," as "actual or simulated":
> (i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;
> (ii) bestiality;

(iii) masturbation;
(iv) sadistic or masochistic abuse; or
(v) lascivious exhibition of the genitals or pubic area of any person.

c.     Title 18, United States Code, Section 2256(8) defines "child pornography" as: any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where--

    (A)    the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct;

    (B)    such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or

    (C)    such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct.

d..    Title 18, U.S.C. Section 2422(b) provides in relevant part that:

Whoever, using the mail or any facility or means of interstate or foreign commerce...knowingly persuades, induces, entices or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so...

e.     Title 22 D.C. Code, Section 3008 provides in relevant part that:

Whoever, being at least 4 years older than a child, engages in a sexual act with that child or causes that child to engage in a sexual act shall be [punished as provided].

f.     Title 22, D.C. Code Section 3001 defines "sexual act" as:

    (A) The penetration, however slight, of the anus or vulva of another by a penis;

    (B) Contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus; or

    (C) The penetration, however slight, of the anus or vulva by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade or arouse or gratify the sexual desire of any person.

## DEFINITIONS

8.     The following terms have the indicated meaning in this affidavit:

a.     The term "minor," "sexually explicit conduct," and "visual depiction," as used herein, are defined as set forth in Title 18, United States Code, Section 2256.

b.     The term "child pornography," as used herein, is defined as set forth in Title 18, United States Code, Section 8, and means any visual depiction of a minor involved in "sexually explicit conduct" as that term is defined in Title 18, United States Code, Sections 2256(8)(A) and (C).

c.     The term "computer," as used herein, is defined as set forth in Title 18, United States Code, Section 1030(e)(1).

d.     The terms "records," "documents," and "materials" include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, paintings), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), cell phones, Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, Bemoulli drives, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

## <u>USE OF COMPUTERS WITH CHILD PORNOGRAPHY</u>

9.     I have received training in computer crime investigation.  I also own a computer and use computers in the course of my work in law enforcement and have personal knowledge regarding the operation of computers.  Based on this training, experience, and information provided to me by other law enforcement personnel involved in this investigation, I know the following:

a.     The Internet is a global network which allows for the sharing of data across computers attached to the network.

b.     Individual users typically access the Internet through a local Internet Service Provider ("ISP")(such as Yahoo) through a modem or other connection device, such as a cable or Digital Subscriber Line ("DSL").  When accessing the Internet, the ISP will assign each user an Internet Protocol ("IP") address, a unique number used by a computer to access the Internet. IP addresses can be dynamic, meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet.  IP addresses can also be static, whereby the user's ISP assigns the computer a unique IP address, and that same number is used by the user every time the computer accesses the Internet.

c.     Communication via the Internet can take place through many different mediums like accessing a website or sending and receiving electronic mail, also known and referred to herein as "e-mail."  E-mail is an electronic form of communication which can contain letter-type correspondence and graphic images.  E-mail is similar to conventional paper type mail in that it is addressed from one individual to another.

d.     E-mail messages usually contain a header that gives the screen name, the identity of the Internet access provider, and the return address on the Internet of the individual who

originated the message or graphic.

e.    The Internet also allows individuals to trade pictures or images, often through e-mail or by downloading images from a website or another individual's computer, as described below.

(1)  Photographs and other images can be stored as data on a computer.  This storage can be accomplished using a "scanner," which is an optical device that can recognize images or characters on paper and convert them to digital form by using specialized software.

(2)  After the photograph or other image has been scanned into the computer, the computer stores the data from the image as an individual "file."  Such a file is generally known as a "GIF" (Graphic Interchange Format) or "JPEG" (for the Joint Photographic Experts Group, which wrote the standard) file, recognizable by the ".gif" or ".jpg" file extensions (hereafter referred to as an "image file").

(3)  Computers are capable of displaying an image file as a facsimile of the original image on a computer screen.

(4)  Using a computer connected to a network connected to the Internet, one can transmit and receive image files between computers located in different states or countries.

(5)  An image file itself can be either a single image (one picture only, also known as a computer file), or a multiple image file (two or more pictures, usually "zipped" or compressed using a commonly available utility and recognizable by the ".zip" file extension). Multiple image files can also be placed within an executable file (recognizable by the ".exe" file extension).  When a computer runs the executable file the images can be expanded into several image files.

-7-

(6)  A computer's ability to store images in digital form makes the computer an ideal repository for child pornography.  Images can be stored internally in a computer on its "hard drive," externally on "floppy" disks of several sizes and capacities, or on removable media storage devices.  A single floppy disk can store dozens of images and hundreds of pages of text.  The storage capacities of the electronic storage media (hard drives and floppy disks) used in home computers have grown tremendously within the last several years.  Hard drives with the capacity of a hundred gigabytes are common.  These drives can store tens of thousands of images at a very high resolution. These images can also be stored on the computers of an Internet company hosting the particular website.

(7)  With a modem, a computer user can transport an image file from the Internet or from another user's computer to his own computer, so that the image file is stored in his computer.  The process of transporting an image file to one's own computer is called "downloading." The user can then display the image file on his computer screen, and can "save" or retain the images on his computer for an indefinite time period.

(8)  In addition to permanently storing the downloaded image on his computer, the user may print the image file.  The finished product can appear as a magazine quality picture to be stored or distributed to other collectors.  The original image that was downloaded or transported is maintained in the computer.

(9)  With a modem, a computer user can also send an image file that is retained in his computer to another individual or to areas of the Internet where it can be accessed by many other computer users.  This process of sending an image file is called "uploading."

(10)  The process of "uploading" is similar to the "downloading" process

except the user is sending the computer image file to the individual or to the Internet as a whole
instead of retrieving the information from another computer.

        f.      Another well-known component of the Internet is the World Wide Web, or
the "Web." The Web is a collection of websites located or stored on different computers throughout
the world. Each website is identified by a unique Uniform Resource Locator ("URL"), which
identifies the server on which the website information is stored. Users access websites by typing the
corresponding URL into their web browser.

### USE OF THE INTERNET AND COMPUTERS FOR CHILD PORNOGRAPHY

        10.     Based on my training, experience and conversations with other law enforcement
agents, I know that computers, computer technology and the Internet have revolutionized the way
in which child pornography is produced, distributed, utilized and collected. They have
revolutionized also the way in which child pornography collectors interact with each other. Child
pornography formerly was produced using cameras and film (either still photography or movies).
The photographs required darkroom facilities and a significant amount of skill in order to develop
and reproduce the images. As a result, there were significant costs involved with the production of
pornographic images. To distribute these images on any scale also required significant resources.
The photographs were somewhat bulky and required secure storage to prevent their exposure to the
public. The distribution of these wares was accomplished through a combination of personal
contact, mailings, and telephone calls. Any reimbursement would follow these same paths.

        11.     The development of computers and the Internet has added to the methods used by
child pornography collectors to interact with and sexually exploit children and to produce and
distribute child pornography. Computers and the Internet generally serve four functions in

connection with child pornography. These are: production, communication, distribution, and storage.

        a.    Child pornographers now can produce both still and moving images directly from a common video camera. The captured images can be edited in very similar ways to a photograph. The image can be lightened, darkened, cropped, and manipulated in a wide variety of ways. The producers of child pornography can also use a device known as a scanner to transfer photographs into a computer-readable format. As a result of this technology, it is relatively inexpensive and technically easy to produce, store and distribute child pornography. Further, it is more difficult for law enforcement to detect and investigate child pornography produced with this new technology, as opposed to methods used in the past, which required more elaborate and detectable equipment and facilities.

        b.    Previously, child pornography collectors had to rely on personal contact, United States mail, and telephonic communications in order to sell, trade or market pornography. The development of computer technology has changed that. A modem allows any computer to connect to another computer through the use of telephone lines. By connecting to a host computer, electronic contact can be made to numerous other computers around the world. Once this electronic contact is established, there are numerous outlets and ways that child pornography can be distributed over the Internet.

        c.    Private and/or public Internet relay chat ("IRC") channels can be and are created for the purpose of sharing child pornography. A user can log onto the IRC anonymously and "chat" and/or trade child pornography with other users, either on an individual or group basis. During this type of session no identifying personal information is obvious or available. The only

identifiable or traceable information is the individual's IP address or ISP. IRC chat rooms are one place where pornographers meet to trade child related sexual and non-sexual stories and trade child pornography. In addition, "chat rooms" on ISPs like AOL can be and are created for similar purposes. Both types of chat rooms are places where children may be at risk of being "lured."

   d. Aside from the chat rooms that reside on many service providers' networks, ISPs often allow access to "newsgroups." Newsgroups resemble a bulletin board system where an individual can post messages along with graphic files on a public forum. Any item posted in a news group can be retrieved by any other person who has access to that particular newsgroup. One commonality between a newsgroup posting and e-mail is that they each often contain a message "header" that gives information about the account that originated a particular message and/or graphic files, and the return address to respond to the poster/sender.

   e. Internet websites also can be used to facilitate the exchange of child pornography. A website can house child pornography directly, allowing users who access the website to view and download those images. A website can also house an "Egroup," which is a forum by which persons with shared interests in child pornography can interact in relative privacy. Typically, most Egroups will have a moderator, and membership in the group can be open or by invitation only. The members of an Egroup also typically communicate with each other by sending an e-mail to the group, which is disseminated to all of the members. In addition, each Egroup typically has a web page that the group's members can visit to view archived postings. E-mail messages and postings might include files that contain visual depictions and digital video clips.

f.      These communication structures are ideal for the child pornography collector. The open and anonymous communication allows the user to locate others of similar inclination and still maintain anonymity. Once contact has been established, it is possible to send text messages and graphic images to others. Moreover, the child pornography collector need not use the large service providers. Child pornography collectors can use standard Internet connections, such as those provided by businesses, universities, and government agencies, to communicate with each other and to distribute pornography. These communication links allow contacts around the world as easily as calling next door. Additionally, these communications can be quick, relatively secure, and as anonymous as desired. All of these advantages are well known and are the foundation of transactions between child pornography collectors.

g.      The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution of child pornography. For example, child pornography can be transferred (via electronic mail, through file transfer protocols("FTPs")[1] , or via newsgroup postings) to anyone with access to a computer and modem. Because of the proliferation of commercial services that provide electronic mail service, chat services, and easy access to the Internet, the computer is a preferred method of distribution of child pornographic materials.

h.      The computer's capability to store images in digital form makes it an ideal repository for pornography. A single floppy disk can store dozens of images and hundreds of pages

_____

[1]      An FTP is a protocol that defines how to transfer files from one computer to another. One use, known as "anonymous FTP," allows users who do not have a login name or password to access certain files from another computer, and copy those files to their own computer.

of text. The size of the electronic storage media (commonly referred to as a hard drive) used in home computers has grown tremendously within the last several years. Hard drives with the capacity of 100 gigabytes are not uncommon. These drives can store thousands of images at very high resolution. Further, magnetic storage located in host computers allows child pornographers to hide pornographic images from law enforcement. It is possible to use a video camera to capture an image, process that image in a computer with a video capture board, and to save that image to storage on a host computer in another country. Only careful laboratory examination of electronic storage devices can recreate the evidence trail.

## CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS

12.     Based on my training and experience and conversations that I have had with other federal agents and law enforcement officers, I know that child pornography is not readily available in retail establishments. Accordingly, individuals who wish to obtain child pornography do so usually by ordering it from abroad or by discreet contact, including through the use of the Internet, with other individuals who have it available or by accessing web sites containing child pornography. Child pornography collectors often send and receive electronic mail conversing with other collectors in order to solicit and receive child pornography.

13.     I know that child pornography collectors usually maintain and possess their materials (computer images, pictures, films, magazines, videotapes, correspondence, source information, etc.) in a private secure location such as their home, office, or work space. Images or videos taken off of the Internet are often stored in the hard drive of the computer or on diskettes kept in private locations near the computer such as in locked desks, shelves, contiguous work space, filing cabinets or similar items and areas in office space. These images also can be printed on computer printers and

maintained by child pornography collectors in paper form.  Additionally, child pornography collectors often transfer those images to videotape, either by videotaping with a handheld video camera the images or videos on a computer screen, or by connecting a video cassette recorder to the computer and recording the images or videos directly.

14.    Collectors of child pornography typically retain their materials and related information for many years.  Most collectors of child pornography seek to increase the size of their collections in a manner similar to collectors of coins, stamps, or rare books.  Many retain these materials, including information regarding sources, for their entire adult lives.  Moreover, individuals who distribute and/or collect child pornography generally prefer not to be without their child pornography for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.  In addition, collectors of child pornography rarely destroy correspondence from other collectors or distributors unless their activities are uncovered by law enforcement authorities or others.

15.    Even if a collector of child pornography images attempts to delete images from his computer, however, for example, by moving them to the "Recycle Bin" of a computer, those images usually remain intact on the hard drive of a computer, often for a long period of time, because information on a hard drive is not destroyed until it is physically overwritten with other data or erased from the hard drive.  As a result, even when a computer user thinks he or she has deleted data, in reality it usually remains on the computer and is recoverable.

16.    Accordingly, information in support of probable cause in child pornography cases is less likely to be stale because collectors and traders of child pornography are known to store and retain their collections for extended periods of time, usually in their home.  Indeed, as noted above,

based on my experience with child pornography search warrants, I know that even where information about a suspect's use of child pornography is not current, we typically find child pornography at the location of the search, assuming the suspect still resides there.

17.    Additionally, based on my experience and training, I know that persons who collect and distribute child pornography:

a.    Frequently collect sexually explicit materials in a variety of media, such as photographs, magazines, motion pictures, video tapes, books, slides and/or drawings or other visual media that they use for their own sexual arousal and gratification.  Further, they commonly use this type of sexually explicit material to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, and to demonstrate the desired sexual acts.

b.    Frequently receive sexual gratification, stimulation, and satisfaction from actual physical contact with children and/or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses (in person, in photographs, or other visual media) or from literature describing such activity.

c.    Often correspond and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/collectors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses, telephone numbers and screen names of individuals with whom they have been in contact and who share the same interests in child pornography.

18.    Based on my training and experience and my conversations with law enforcement agents, I have also learned that:

a.    Child pornography is a permanent record of the sexual abuse of a child victim. Each time child pornography is reproduced, downloaded, or forwarded by an Internet user, the victimization of the minor appearing in the pornography is perpetuated.  Such items also are important evidence and indications of an individual whose sexual objects are children, and of that individual's motive, intent, and predisposition to violate federal law related to the production, possession and distribution of child pornography.  Additionally, these items lead to the identification of child victims and other individuals engaging in similar conduct.

b.    Child pornography collectors reinforce their fantasies, often by taking progressive, overt steps aimed at turning the fantasy into reality in some or all of the following ways: collecting and organizing their child-related material; masturbating while viewing the child pornography; engaging children, online and elsewhere, in conversations, sometimes sexually explicit conversations, to fuel and fortify the fantasy; interacting, both directly and indirectly, with other like-minded adults through membership in organizations catering to their sexual preference for children thereby providing a sense of acceptance and validation within a community; gravitating to employment, activities and/or relationships which provide access or proximity to children; and frequently persisting in the criminal conduct even when they have reason to believe the conduct has come to the attention of law enforcement.  These are need-driven behaviors to which the offender is willing to devote considerable time, money, and energy in spite of risks and against self interest. The "collection" is the best indicator that law enforcement has of what the collector *wants* to do, not necessarily what he has done or will do.  The overriding motivation for the collection of child pornography may be to define, fuel, and validate the collectors' most cherished sexual fantasies involving children.

-16-

## THE INVESTIGATION AND THE SUBJECT PREMISES

19.    For the reasons set forth below, there is probable cause to believe that evidence of the transmission and possession of child pornography will be located within the EQUIPMENT seized from the PREMISES.  I have been assisted in this investigation by other law enforcement agents, with whom I have discussed this investigation and the information contained herein.

20.    On June 9, 2008,  Detective Timothy Palchak, a member of the FBI/MPD Innocent Images Task Force was on-line in a location within the District of Columbia and acting in an undercover capacity. Detective Palchak entered a Yahoo fetish room using the screen name "daughterlover_maryland".  Detective Palchak  was posing as a pedophile who was working at a liquor store and met a prostitute, who occasionally allowed him to have sex with her twelve-year old daughter in exchange for money.

21.    At approximately 11:42 a.m., an individual, later identified as MICHAEL GENE REED,  using the e-mail address  "horneydad08@yahoo.com " contacted Detective Palchak and engaged into a conversation about engaging in sexual acts with the fictitious twelve-year old girl. During this and subsequent on-line conversations, REED identified himself as "Jake Edwards" or "Jake". Palchak used the screen name "Jim" During the initial conversation REED described in detail how he would like to engage in sexual acts with minors.  He described sex acts, including vaginal intercourse, oral sex and penetration of the child vaginally with his hand that he wanted to perform with the twelve year-old girl.

22.    During the conversations on-line which took place over several days between June 9, and June 13, 2008,  Detective Palchak and REED also discussed child pornography.  REED stated that he had child pornography in his possession and provided descriptions of the child pornography

and the locations in which he stored it in his residence.  REED asked Palchak whether he had seen

any good "pedo clips" and referenced a known series of child pornography that contains images of

a prepubescent girl engaging in sex acts with an adult male, stating, "im sure you have seen vicky."

According to REED,  he had over 50 gigabytes of child porn which  he "reformatted," but now he

still has "a few."  REED also provided to Detective Palchak an Internet link to a website containing

child pornography.  During one on-line  conversation,  Palchak sent a digital photograph of a clothed

pre-pubescent girl whom he  identified as the twelve year-old child with whom he engaged in sex.

23.    Detective Palchak also had several telephone conversations with REED after  REED

provided  him  a  cellular  telephone  phone  number.    In  the  conversations  with  Palchak,  REED

indicated that he was interested in coming to the District of Columbia to meet Detective Palchak

and engage in sexual acts with the minor child.  He indicated that he could bring money or child

pornography as payment for being allowed to have sex with the child..  In order to facilitate a

meeting, REED provided a physical description of himself.  He said that he was five feet six inches

tall, weighed 145 pounds and wore glasses.  Detective Palchak  arranged to meet REED  on June 13,

2008, at a restaurant located in a hotel in the District of Columbia and to arrange to make the

fictitious child available to REED for the purpose of REED's engaging in sexual acts her.

24.    Investigation revealed that the cell phone number provided to Detective Palchak was

by the individual using the name "Jake" was subscribed to by  Michael Gene Reed with a billing

address of 602 Saint Georges Station Rd, Reisterstown, MD 21136.  A records check of MVA Driver

Licensing System, revealed that there is a Michael Gene Reed whose date of birth was September

11, 1978, with a listed address of 602 Saint Georges Station Road, Reisterstown, Maryland, whose

physical description met that provided by to Detective Palchak

25.    On June 13, 2008, your affiant along with other Metropolitan Police Officers and agents from the Federal Bureau of Investigation conducted surveillance at the location at which REED and Detective Palchak agreed to meet.  At approximately 11:40 a.m., a person matching the physical description provided to Palchak in the on-line chats arrived at the location and introduced himself to Palchak as "Jake".  This person, later identified as MICHAEL GENE REED, spoke with Palchak for several minutes at the restaurant. During the conversation, REED asked how long it would take to bring the fictitious child to the hotel. REED confirmed that he had a large amount of child pornography at his residence and that the pornography was located on an external hard drive in the basement of his home.   Shortly thereafter, REED was arrested for interstate travel for the purpose of engaging in illicit sexual conduct with a minor in violation of 18, U.S.C. Section 2423(b).

26.    In a post-arrest statement, REED told your affiant that he used a desktop computer located in the basement of his home when he engaged in on-line conversations with "Jim", the screen name used by Detective Palchak.  On June 13, 2008,  law enforcement officers went to REED's residence. Sarah Reed, the wife of Michael Gene Reed, gave officers written consent to search the PREMISES.. Located within the basement of the PREMISES were several computers and various media storage devices similar to those described by the defendant.  Among the items seized by the law enforcement were the following: an IBM Travelstar hard drive, 10 GB, S/N 9ZYK6506; a Western Digital hard drive, 40 GB, S/N WCAAT7664664; a Gateway computer, S/N 0011461328; a Hewlett Packard computer XL768, S/N US03312704; a Dell Vostro 200, Service Tag 4651PD1; a Gateway 830GM computer, S/N XAB5481004643; a Gateway laptop computer model MT6840, S/N T3L75H1004297; a red Memorex USB flash drive, 512mb; 1 Hewlett Packard Photosmart 318 S/N faded; and a Hewlett Packard IPAQ S/N 2CK5020W4B with 128mb memory card.  All of these

items are capable being used to store, transport, and/or transfer images and other media files associated with child pornography.  Law enforcement officers transported the items from the PREMISES to the District of Columbia where they remain in the custody and control of the FBI. Further examination is required to determine which of these items actually contain the child pornography described by REED and the image that was sent to him by Detective Palchak.

## REQUEST TO SEARCH THE EQUIPMENT

27.     In light of the foregoing information, and based on my experience and training, I submit that there is probable cause to believe that the EQUIPMENT contains child pornography or other evidence concerning violations of Title 18, United States Code, Section 2252A, as well as violations of Title 18, United States Code Section 2422(b),and that the fruits and instrumentalities of those violations can be found at the PREMISES.

28.     Specifically, this EQUIPMENT is likely to be the primary means of accessing the Internet for purposes of receiving or collecting child pornography and also the means of communication for the attempted enticement of a child to engage in illicit sexual conduct and therefore may be searched "as the means of committing [the] criminal offense" pursuant to Federal Rule of Criminal Procedure 41(b)(3).  The evidence, fruits, and instrumentalities of the offenses include the items described in Attachment A, attached.

## METHODS TO BE USED TO SEIZE AND SEARCH
## COMPUTERS AND COMPUTER-RELATED EQUIPMENT

29.     Based upon my training, experience, and information related to me by agents and others involved in the forensic examination of computers and other electronic media, I know that electronic data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes, and memory chips.  I also know that searching

computerized information for evidence or instrumentalities of a crime commonly requires agents to seize most or all of a computer system's input/output peripheral devices, related software documentation, and data security devices (including passwords), so that a qualified computer expert can accurately retrieve data from the system or phone in a laboratory or other controlled environment.  This is true for the following reasons:

a.     Searching computer systems is a highly technical process which requires specific expertise and specialized equipment.  There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application, or operating system that is being searched.

b.     Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

c.     The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the PREMISES.  A single megabyte of storage space is the equivalent of 500

-21-

double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing up to 100 gigabytes of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of millions of pages of data.

        d.     Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or instrumentalities of a crime.

        30.     In searching for data capable of being read, stored, or interpreted by a computer, law enforcement personnel executing the applicable Search Warrant will employ the following procedure:

        a.     Upon securing the PREMISES, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will search and seize any

computers, computer equipment, and storage devices and transport these items to an appropriate law enforcement laboratory for review as to whether these items contain contraband. Because of the lengthy period of time necessary to perform a complete search of all material contained in any computers, computer equipment and storage devices, it would not be feasible to conduct this search on the PREMISES, and seizure is necessary so that the preservation of data is not jeopardized. The computers, computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

        b.      If upon the search of the computers, computer equipment, and storage devices it is determined that the computers, computer equipment, and storage devices do not contain contraband, an instrumentality of the offense, a fruit of the criminal activity, or evidence of the offense specified above, then the computer personnel will return the cell phones, computer equipment and storage devices to the PREMISES.

        c.      The analysis of electronically stored data may entail any or all of several different techniques. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

31.     Any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the offense specified above.

32.     In searching the data, the computer personnel may examine all of the data contained in the cell phones, computers, computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein. In addition, the computer personnel may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the data falls within the list of items to be seized as set forth in this affidavit.

33.     If the computer personnel determine that the cell phones, computers, computer equipment and storage devices are no longer necessary to retrieve and preserve the data, and the items are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(b), the Government will return these items.

## CONCLUSION

34.     Based on the aforementioned factual information, your affiant respectfully submits that there is probable cause to believe that Michael Gene Reed has violated Title 18, United States Code, Sections 2252A, and 2422(b)that Reed has used a computer (or computers) located inside of the premises described herein to do so.

35.     Given the propensity of child pornography collectors to maintain and increase the number of images in their collections, your affiant believes that evidence, fruits and instrumentalities of violations of Title 18, United States Code, Section 2252A(a)(2)and (a)(4), listed in Attachment A to this Affidavit, which is incorporated herein by reference, are concealed within the

EQUIPMENT seized from the PREMISES. There is also reason to believe that images of a prepubescent girl that your affiant sent to Reed, including an image purporting to be 12 year-old child, an image that constitutes evidence of a violation of Title 18 United States Code 2422(b), are located within the EQUIPMENT. Rule 41 of the Federal Rules of Criminal Procedure authorizes the government to seize and retain evidence and instrumentalities of a crime for a reasonable time, and to examine, analyze, and test them.

36.     Based upon my knowledge, training and experience, and consultations with law enforcement experts, I know that searching and seizing information from computers often requires agents to seize most or all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or other controlled environment.

37.     Your affiant, therefore, respectfully requests that the attached warrants be issued authorizing the search and seizure of the items listed in Attachment A.


_____
SPECIAL AGENT DANIEL M. BRADLEY
FEDERAL BUREAU OF INVESTIGATION


Sworn and subscribed before me
this ____ day of June 2008


_____
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

1.      Records, documents, and materials, including but not limited to, tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drive and other computer related operation equipment, digital cameras, video cameras, scanners in addition to computer photographs, Graphic Interchange formats and/or photographs, undeveloped photographic film, slides, and other visual depictions of such Graphic Interchange formats (including, but not limited to, JPG, GIF, TIF, AVI, RM and MPEG), and the data within the aforesaid objects relating to said materials, which may be, or are, used to:  visually depict child pornography; contain information pertaining to the interest in child pornography, or sexual activity with children; and/or distribute, receive, or possess child pornography, or information pertaining to an interest in child pornography.

2.      Originals and copies of photographs, negatives, magazines, motion pictures, video tapes, books, slides, audiotapes, handwritten notes, drawings and/or other visual media that depict what appears to be a minor engaged in sexually explicit conduct.

3.      Materials and photographs depicting sexually explicit conduct with what appear to be minors, including material that may assist in the identification and location of such minors.

4.      Records evidencing ownership and/or use of computer equipment found in the Premises described above.

5.      Records which evidence membership with any website or chat room or organizations related to child pornography, including without limitation, e-mail, correspondence and envelopes, passwords, credit card bills or receipts, and URL addresses.

6. Images of prepubescent female children sent by your affiant to "daughterlover_maryland" and e-mail correspondence sent to the e-mail address "horneydad08@yahoo.com" or any screen names or e-mail addresses associated with the alias Jake Edwards.

**ATTACHMENT B**

The items to be searched referred to in the affidavit as the "EQUIPMENT" are those items surrendered to law enforcement by Sarah Reed on Junde 13, 2008, in connection with the consensual search of the premises located at 602 Saint Georges Station Road, Reisterstown, Maryland 21136 . The EQUIPMENT includes the following items: an IBM Travelstar hard drive, 10 GB, S/N 9ZYK6506; a Western Digital hard drive, 40 GB, S/N WCAAT7664664; a Gateway computer, S/N 0011461328; a Hewlett Packard computer XL768, S/N US03312704; a Dell Vostro 200, Service Tag 4651PD1; a Gateway 830GM computer, S/N XAB5481004643; a Gateway laptop computer model MT6840, S/N T3L75H1004297; a red Memorex USB flash drive, 512mb; 1 Hewlett Packard Photosmart 318 S/N faded; a Hewlett Packard IPAQ S/N 2CK5020W4B with 128mb memory card and any other items taken by provided to law enforcement as part of the consensual search of the PREMISES on June 13, 2008, which items are all now physically located within the District of Columbia, at the Washington, D.C. filed office of the Federal Bureau of Investigation located at 601 4th Street NW, Washington, D.C.